**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
ANN. A. BRIGHT                          )
                                        )
    **Plaintiff,**                      )
                                        )
        v.                              )   **Civil Action No.   08-0755 (ESH)**
                                        )
**MICHAEL J. COPPS, Acting Chairman**   )
**Federal Communications Commission**   )
                                        )
    **Defendant.**                      )
                                        )
_____ )

## <u>MEMORANDUM OPINION</u>

Plaintiff Ann Bright ("Bright"), an African American female, is employed as an auditor with the Federal Communications Commission ("FCC"). She contends that her employer discriminated against her and subjected her to a hostile work environment because of her race and gender and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. § 2000e -2(a).[1] Before the Court is defendant's motion for summary judgment. For the reasons set forth below, defendant's motion for summary judgment will be granted in part and denied in part.

### BACKGROUND

### I.    FACTUAL BACKGROUND

Bright began her career with the FCC as an accountant in the Cable Services Bureau in 1994. (Def.'s Mot. for Summ. J. ("Def.'s Mot."), Statement of Material Facts Not in Dispute

---

[1] This is a consolidated case consisting of claims made in two complaints, one filed in 2008 in this case, *Bright v. FCC*, No. 08-cv-755, Apr. 30, 2008 ("2008 Complaint") and one filed in 2010 in *Bright v. Genachowski*, FCC, No. 10-cv-0397, Mar. 9, 2010 ("2010 Complaint"). There is some overlap of claims and factual allegations within these two complaints, as well as between these complaints and Bright's prior Title VII suits. (*See infra* n. 11.)

("Def.'s Stmt.") ¶ 1; Def.'s Mot. at 3.)  In 2002, Bright and a number of other auditors joined the newly-created Investigations and Hearings Division ("IHD"), which is part of the FCC's Enforcement Bureau ("EB"), as part of an agency-wide reorganization.  (*Id.* ¶ 2.)

Prior to the 2002 reorganization, the EB did not conduct audits; after the reorganization, IHD began conducting audits as a means of investigating potential violations of the Communications Act.  (*Id.* ¶ 3 (referring to the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (amending Communication Act of 1934)); *see also* Def.'s Mot., Ex. 3 (Trent Harkrader  Dep. ("Harkrader Dep.")) 96:9 – 96:17, Oct. 8, 2009.)  This audit work included review of mergers, numbering audits, audit work regarding telecommunications companies, and oversight of a large grant fund, the Universal Service Fund ("USF"), that all telecommunications carriers pay into.  (*See* Def.'s Stmt.  ¶ 4; Harkrader Dep. 97:1-97:8; Def.'s Mot., Ex. 2 (Ann Bright Dep. ("Bright Dep.")) 16:6-16:10, July 12, 2011.)  From the time that Bright was promoted to the position of auditor in 2003 until March 2005, she worked on only one audit, which was related to the USF.  (Def.'s Stmt. ¶ 21; Bright Dep. 48:19-48:22.)

In March 2005 the new FCC's Chairman, Kevin Martin, issued a mandate directing the EB to use other means of enforcement instead of auditing individual companies.  (Def.'s Stmt.  ¶ 6; *see* Def.'s Mot., Ex. 1 (Hillary DeNigro Dep. ("DeNigro Dep.")) 18:12-19:1, July 29, 2011.)  As a result, work within the IHD moved away from traditional audit work and became more like that performed prior to the 2002 reorganization.  (DeNigro Dep. 20:1-20:13, 28:4-28:9; Harkrader Dep.  98:7-98:13.)

A.      **Detailing IHD Auditors to the Office of the Managing Director ("OMD")**

In March 2005, there were eighteen full-time auditors in the IHD and, following Chairman Martin's announcement, supervisors within the EB struggled to find auditing work

commensurate with the auditors' skill levels.  (DeNigro Dep. 24:22-25, 29:7-29:9, 37:7-37:13.)[2]

Some auditors were "detailed" (temporarily assigned) to work with other agencies that could

make use of their skills.  Some of these details resulted in "reassignment" —permanent

placement in other agencies.  (*Id*. 36:1-36:12.)  Ten of the eighteen auditors were initially

detailed (and subsequently permanently reassigned) to the Office of the Managing Director

("OMD").  (Def.'s Mot, Ex. 10 (Decl. of Noelle M. Green) ("Green Decl.") ¶ 3; Def.'s Mot. at

6.)[3]  Nine of those detailed to the OMD were Caucasian and one was African-American.  (Def.'s

Reply at 6.)  Eight of those detailed to the OMD were male and two were female.  (*Id*.)  The

racial and gender make-up of the eight auditors who remained in the IHD was as follows: one

African-American female, one African-American male, one Hispanic male, and one Asian male.

(Green Decl. ¶ 5; Pl.'s Mot. at 14-15.)  The other four auditors remaining in the IHD were

Caucasian.  (Green Decl. ¶ 5.)[4]  According to Bright, four of these eight individuals had either

filed EEO complaints or union grievances.  (Pl.'s Opp'n at 15.)

---

[2] The number of auditors cited by the parties does not appear to include Chief Auditor Hugh
Boyle, who is also considered part of the IHD supervisory structure and was involved in
personnel actions and other employment decisions.  (*See* Def.'s Interrogs. Resp. 5-6).

[3] Seven of the ten auditors were detailed to the OMD between January 25, 2006, and February
17, 2006.  (*See* Def.'s Interrogs. Resp. at 10.)  The eighth was detailed to the OMD on June 23,
2006.  (*Id*.)  The ninth and tenth auditors, who telecommuted, were detailed to the OMD on
January 2, 2008.  (*Id*.)  Before being detailed to the OMD, the ninth and tenth auditors were still
doing auditing work as part of the IHD (in contrast to other IHD auditors) because they were
completing audits that remained pending at the time of Chairman Martin's announcement.  (*See*
Def.'s Stmt. ¶ 25; Def.'s Mot., Ex. 7 (Hugh Boyle Dep. ("Boyle Dep.") 121:9-122:14; DeNigro
Dep. 19:22-22:20; *see also* Def.'s Mot. at 17-19.)

[4] In support of its motion, defendant has submitted a list of auditors who were detailed to the
OMD and a list of auditors who remained in the IHD.  (*Id*. ¶¶ 3, 5.)  This list includes Chief
Auditor Hugh Boyle and does not include Ann Bright.  (*Id*. ¶ 5.)  For the purposes of
determining racial and gender disparities in the two groups of auditors, the Court will use the
method of counting that the parties have used—it will count Ann Bright as one of the auditors
remaining in the IHD, but not Hugh Boyle.

**B.      Work Assignments within IHD Auditors**

The auditors who remained in the IHD were required to perform other IHD work, some significant portion of which was clerical.  (Def.'s Stmt.  ¶¶ 9-15; Pl.'s Stmt. ¶¶ 10-14.)   These non-auditing assignments provided to the auditors after 2005 included working with the Media Bureau to determine the amount of local content on broadcast stations, working to transition from analog to digital television, verifying the accuracy of invoicing related to contractor work associated with the digital television transition, and several "all-hands assignments," including work related to the Telecommunications Consumer Protection Act, 47 U.S.C. §§ 227 *et seq*., and processing "indecency" complaints against television stations, radio stations, and cable satellite providers.   (Def.'s Stmt. ¶¶ 10, 11; DeNigro Dep. 37:7-41:12: Def.'s Mot., Ex. 4 (Benigno Bartolome Dep. ("Bartolome Dep.")) 12:16-12:22, July 29, 2011.)   All auditors who remained in the IHD after 2006-2007 were asked to work on assignments relating to indecency complaints. (Def.'s Stmt. ¶ 13; Bartolome Dep. 21:21-22:21.)

Beginning in 2007 Bright was assigned to work on indecency complaints.  (2010 Compl. ¶ 8.)  Bright maintains that she was asked to do more clerical work than the other auditors remaining in the IHD.  (Bright Dep. 21:5-21:7; 2010 Compl. ¶ 9; *see also* 2008 Compl. ¶¶ 16, 17 (alleging that Bright was required to attend a training seminar to review indecency complaints and subsequently assigned duties including preparing mailing labels and stuffing envelopes).)

After 2005, the IHD conducted a very small amount of "in-house" audit work within the EB.  Some auditors who remained in the IHD were assigned to that auditing work and some were offered the opportunity to do auditing work through details to other agencies.  (Def.'s Stmt. ¶¶ 16-18; *see* DeNigro Dep. 20:4-20:19, 29:10-29:18, 107:20-108:9.)  Defendant contends that work within the IHD was distributed in an equitable manner.  (Def.'s Stmt. ¶¶ 13, 16.)  Bright alleges that in 2007 three Caucasian male auditors were given audit assignments and were not

given clerical work assignments (2008 Compl. ¶ 19) and that she, by contrast, "has not received an auditing assignments [sic] since early 2005." (*Id*.)

Between 2005 and 2009, Bright worked on one of the in-house audits and was offered various other details (Def.'s Stmt. ¶ 28; Def.'s Mot., Ex. 5 (Hillary DeNigro Decl. ("DeNigro Decl.")) ¶ 3; Bartolome Dep. 54:21- 55:9; Bright Dep. 53:24-54:1), although the parties disagree regarding whether those details involved "substantive" work. (*Compare* Def.'s Stmt. ¶ 18 *with* Pl.'s Stmt. ¶ 18.)[5] Bright worked on some of these details and declined to work on others. (Def.'s Stmt. ¶¶ 17-19; Pl.'s Stmt. ¶ 18.) Her supervisors and coworkers on the projects she did work on reported that she did not complete her work on some of those projects. (DeNigro Decl. ¶ 4.)

## C.    Reassignment Request

On March 13, 2007, Bright met with George Dillon to request to be reassigned to the Atlanta field office of the EB. (Bright Dep. 112:16-112:22; Pl.'s Opp'n at 17; s*ee also id*. at 19 (indicating that this discussion occurred in April 2007).)[6] At that time there were no open auditor positions in the Atlanta office and it was only staffed with engineers and compliance specialists. (Def.'s Stmt. ¶¶ 23-24; Def.'s Mot., Ex. 8 (Kris Montieth Dep. ("Montieth Dep.")) 98:3- 98:10, Sept. 5, 2007.) The only auditors that were part of the EB but not based at EB headquarters were the two individuals based in New York who telecommuted; these individuals had been part of the Common Carrier Bureau since approximately 1978. (Def.'s Stmt. ¶ 25; DeNigro Dep. 22:5-24:7.) When the FCC reorganized and moved them to the EB, they were

---

[5] In 2009, plaintiff and all other IHD auditors were transferred out of the IHD. (*See* Def.'s Stmt. ¶ 29; DeNigro Dep. 108:4-108:8.)

[6] Neither party has provided Dillon's title. This meeting came about after Bright expressed her desire for reassignment to EB Bureau Chief Kris Monteith, and Monteith advised her to speak to Dillon about the request. (Pl.'s Opp'n, Ex. A (Pl.'s Resp. to Def.'s Interrogs.) at 13.)

permitted to remain part of the New York field office.  (Def.'s Stmt. ¶ 25; DeNigro Dep. 22:5-24:7.)  No other field office had auditors.  (Def.'s Mot. at 28; *see also* Bright Dep. 112:11-112:15, 121:4-121:10.)  When Bright asked to be reassigned to the Atlanta office, Dillon explained that, in order for an employee to be reassigned, "there needs to be a vacancy at that office."  (Def.'s Stmt. ¶ 22; Def.'s Mot., Ex. 9 (George Dillon Dep. ("Dillon Dep.")) 153:17-154:23, Sept. 13, 2007.)[7]  He told her that there were only two non-auditor positions available in the Atlanta office—senior agent engineer and compliance specialist.  (Def.'s Stmt. ¶ 24; Pl.'s Opp'n at 19.) He indicated that he thought that she would not likely be selected because of her lack of technical engineering experience.  (Dillon Dep. 151:8-152:11; Pl.'s Opp'n at 19.)  He also said that he thought that she might make the "best qualified" list for the compliance specialist position because it did not require a technical degree in engineering.  (Dillon Dep. 151:23-152:14.)  Bright responded that the compliance specialist position was not a professional grade position and would be a demotion for her. [8]

### D.  Subsequent Work Environment, Medical Accommodations, and Request for In-Person Meeting

According to Bright, she was "required to endure mistreatment with regard to the undermining of her mental capabilities" and "forced to work in an unsympathetic and hostile working environment" throughout this time.  (2008 Compl. ¶ 20.)  Bright alleges that, at the time

---

[7] Dillon testified that no auditor had ever been reassigned to an office to fill a position that did not already exist except where necessary for "humane" reasons such as terminal illness.  (Dillon Dep. 154:3-23.)

[8] Bright alleges that the compliance specialist position was a GS-7 (Pl.'s Opp'n at 17), whereas Dillon indicated that he thought that it was a GS-14.  (Dillon Dep. 152:5; *accord* Montieth Dep. 105:13-105:20 (stating that she believed that a compliance specialist could be a GS-13 or GS-14).)

of these events, the FCC indecency policy allowed broadcasters to use the word "nigger," which she found "highly offensive." (*Id.* ¶ 21.)

Sometime on or about May 2, 2007, Bright filed a charge of discrimination ("2007 EEO Complaint") with the EEO Program Manager within the FCC. (*See* 2008 Compl. ¶ 24.)

On June 26, 2007, Bright met with Montieth as part of the informal EEO process. (*Id.*) On that same day, Bright was assigned a task involving the preparation of labels and stuffing envelopes. (Pl.'s Opp'n at 15.)

In February 2008 Ben Bartolome, one of Bright's direct supervisors and the IHD manager overseeing the indeceny project, requested that Bright update the project database, confirm that indecency complaints had been scanned, and draft letters. (*Id.* at 3; Def.'s Mot. at 35.) After Bright indicated that, due to her carpal tunnel syndrome,[9] she could not perform repetitive tasks like typing, she was permitted to handwrite letters. (Pl.'s Opp'n at 16.) Robin Peltzman, a Caucasian paralegal, was assigned to type the letters she drafted. (*Id.*)

In April 2008 Bright was diagnosed with chronic cervical strain, in addition to her carpal tunnel syndrome (which was originally diagnosed in 1996). (*See id.* ¶¶ 7, 11.) To accommodate her medical disabilities, Bright was provided with assistants to help her write and type (Def.'s Stmt. ¶ 31; *see* Bartolome Dep. 65:15 – 66:18), voice-activated software, a special chair, and other accommodations with respect to her work station. (Def.'s Stmt. ¶ 32; *see* Def.'s Mot., Ex. 12 ( Lawrence Schaffner Dep. ("Schaffner Dep.")) 24:11- 25:3, July 29, 2011.)

---

[9] In 1996 Bright was diagnosed with carpal tunnel syndrome. (2010 Compl. ¶ 7.) Her physician recommended that Bright's workstation be assessed and that adjustments be made for an ergonomic station. (*Id.*) The agency (through the bureau in which Bright was employed at that time) provided an ergonomic chair and keyboard (*id.*), but there is no evidence that a formal work station assessment was performed. Bright alleges that she informed her EB supervisors of her condition at some point prior to 2005. (*See* Pl.'s Opp'n at 19.)

From May through November 2008, Bright was assigned to assist Patricia Green, another auditor, with the "For Cause Audit/Investigation."  (2010 Compl. ¶¶ 12-13; Pl.'s Opp'n at 16 (referring to this project as the "numbering audit".).)  This assignment was made when Green, who was already on the "For Cause Audit/Investigation," requested assistance.  (2010 Compl. ¶ 12.)

On August 14, 2008, IHD Chief Hillary DeNigro ("DeNigro") approved an agreement allowing Bright to telecommute to work two days per week.  (*See* Def.'s Mot., Ex. 14 ("Telecommuting Agreement").)  The first sentence of this agreement provided that, even on telecommuting days, employees may be required to come into the office for reasons including meetings, trainings, and work that must be conducted on-site.  (*Id*.)

On November 20, 2008, Bright received a mid-year evaluation from her supervisors Trent Harkrader and Bartolome.  (2010 Compl. ¶ 14.)  At that meeting, Bright indicated that she experienced pain when she performed repetitive work and, when asked what work she would be able to do, she responded "audit work."  (*Id*.)  Bright alleges that, later that day, DeNigro yelled at her outside her office and, when Bright told her to watch her tone, DeNigro threatened Bright with insubordination.  (*Id*.)

On November 21, 2008, Bright was removed from the audit assignment and assigned to perform clerical duties instead.   (*Id*. ¶ 13.)  Later that day, a coworker told Bright that she had been removed because management had decided that only one auditor would be permitted to work on the "For Cause Audit/Investigation."  (*Id*. ¶ 15.)

In her opposition, Bright alleges that, from November 2008 through June 2009, her clerical duties increased, she was assigned a disproportionately large number of indecency complaints, she was given deadlines for her work, and she was required to submit daily status

updates.  (Pl.'s Opp'n at 16.)  She also alleges that EB management sent her harassing e-mails and made harassing telephone calls regarding her work performance.  (*Id*.)

On April 30, 2009, Bartolome asked Bright to come to the office the next day to attend an in-person meeting with him and another employee.  (*Id*. ¶ 17.)  He called for this face-to-face meeting after he learned that Bright had decided not to continue with the work assignment to which she was detailed and had not informed her superiors.  (Def.'s Mot. 38; Bartolome Dep. 45:4-48:2.)  The appointed day for the meeting was a day on which Bright would ordinarily work from home pursuant to her telecommuting agreement.   (Pl.'s Opp'n at 4.)  The telecommuting agreement "requires that if the work requirement so dictate, that anyone who's telecommuting needs to come to the office."  (Def.'s Stmt. ¶ 30 (quoting DeNigro Dep. 86:22-87:3); Telecommuting Agreement at 2 ("The employee, when telecommuting, agrees to report to the official duty station as required for training, conferences, mandatory meetings, and to receive assignments and review completed work.").)

At that meeting Bright was assigned administrative work and given timetables for completing her work.  (2010 Compl. ¶ 19.)   Bright also alleges that on the afternoon of May 1, 2009, Bartolome sent her an email that "attempted to defame Ms. Bright's character and demean her…."  (*Id*. ¶ 20.)[10]

In October 2009, all auditors (including plaintiff) within the IHD were reassigned to other offices— principally the OMD.  (DeNigro Dep. 108:4-108:9.)

## II.    PROCEDURAL BACKGROUND

On April 30, 2008, Bright filed a complaint in this Court for claims arising from the 2007 EEO Complaint.  (*See* 2008 Compl.)  On March 9, 2010, Bright filed a second complaint in this

---

[10] Neither this email, nor any other emails that Bright references (*see* Pl.'s Opp'n at 16), appear in the record.

Court.  (*See* 2010 Compl.)[11]  The cases were consolidated on June 22, 2010.  (*See* Order of June

22, 2010 (Dkt. No. 28).)  Bright sues for discrimination based on her race and gender and for

retaliation for her involvement in protected activity[12] based on (1) the failure to detail her to an

auditor position within the OMD, (2) the clerical nature of the work assignments she was asked

to perform as an auditor at the IHD, (3) the denial of her request for reassignment to the Atlanta

field office, (4) the mandatory in-person meeting on May 1, 2009, (5) defendant's manner of

responding to her request for medical accommodations, and (6) a hostile work environment. [13]

Defendant has moved for summary judgment as to all claims.

## ANALYSIS

## I.    LEGAL STANDARDS

### A.    RULE 56

---

[11] Bright has litigated at least two previous discrimination cases in this jurisdiction.  *See Bright v. Kennard*, 99-cv-1934 (D.D.C. Feb. 22, 2001) (granting summary judgment to defendant on claims of discrimination and retaliation based on allegations of improper work assignments, failure to promote, unfair performance evaluations, and a hostile work environment from 1995 through 1999); *Bright v. Powell*, No. 00-cv-1579 (D.D.C. Oct. 20, 2003) (finding claims of discrimination and retaliation based on allegations of failure to promote barred by res judicata, but hostile work environment claim based on 1998 incident not barred by res judicata), *appeal voluntarily dismissed*, No. 04-5056 (Apr. 28, 2004).  Thus, many of the factual allegations in Bright's submissions to this Court (*see* Pl.'s Opp'n at 1-2, 11-13; 2008 Compl. ¶¶ 8-10) have already been addressed and dismissed in other cases.

[12] Although Bright alleges that she filed an EEO Complaint in 2007 and that she was involved in an EEO deposition of some type in 2002, she has not explained her theory of causation, nor has she clearly identified what protected activity forms the basis for her retaliation claims.  Therefore, one cannot determine if she can show a causal connection between the protected activity and the alleged acts of retaliation.

[13] Plaintiff also sues for disparate treatment (apparently because of race, gender, and possibly retaliation) based on acts arising prior to 2007.  (*See* 2008 Compl. ¶¶ 8-15 (alleging failure to promote and failure to make her a team leader or "Auditor in Charge").)  In its motion for summary judgment, defendant argues that claims based on these acts were not exhausted because they were not part of the 2007 EEO complaint.  (*See* Def.'s Mot. at 42-44; Def.'s Reply at 4, n.1.)  Bright has not responded to this argument in her opposition, and, therefore, it will be treated as conceded.  (*See also supra* note 11.)

Defendant has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party asserting that a fact is untrue or that it is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in her favor. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." *Id*.  For a dispute about a material fact to be "genuine," there must be sufficient

admissible evidence that a reasonable  trier of fact could find for the nonmoving party.  *Id*.  A

court must determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id*. at 251-52.  "If the evidence is merely colorable, or is not sufficiently probative, summary

judgment may be granted."  *Id*. at 249-50 (internal citations omitted).  The adverse party must

"do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  Conclusory

assertions offered without any factual basis in the record cannot create a genuine dispute.  *See*

*Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp*., 564 F.3d 462, 465-66 (D.C. Cir. 2009).

### B.      TITLE VII

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, condition, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The "two essential elements" of a

discrimination claim under this section are "that (1) plaintiff suffered an adverse employment

action (2) because of the plaintiff's  race… [or] sex."  *Baloch v. Kempthorne*, 550 F.3d 1191,

1196  (D.C. Cir. 2008).  "A plaintiff must prove both elements to sustain a discrimination claim."

*Id*.

Title VII also contains an anti-retaliation provision that makes it unlawful for an

employer to "discriminate against any of his employees or applicants for employment . . .

because he has opposed any practice made an unlawful employment practice by this subchapter,

or because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter."  *Id*. § 2000e-3(a).  The two

essential elements of a retaliation claim under this section are that plaintiff has "suffered (1) a materially adverse action (2) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198.

In the absence of direct evidence of discrimination or retaliation, Title VII claims are assessed under a burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802-03 (1973). Pursuant to that framework, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination or retaliation. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). To establish a prima facie case of discrimination, Bright must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (internal quotation marks omitted). The requirements to establish a prima facie case of retaliation differ slightly, requiring her to show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection existed between the two. *Id.*

Once the plaintiff has made a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [challenged employment action].'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). However, the D.C. Circuit has stressed that once an employer has proffered a nondiscriminatory reason, the *McDonnell Douglas* burden-shifting framework disappears, and the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007); *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment

action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.").

## II.    WORK ASSIGNMENTS

Plaintiff claims that defendant discriminated and retaliated against her by requiring her to perform non-auditing (clerical) work while providing her fellow auditors with substantive work. (Pl.'s Opp'n at 11-18.)  Her challenge is based on two discrete claims, both of which she says were motivated by discrimination and retaliation: first, she claims that discrimination and retaliation underlay the decision to detail certain auditors to another department—the OMD, and, second she claims that discrimination and retaliation informed the work that was assigned to her as compared with the other auditors who remained within the IHD.  (*Id.*)

### A.    Detailing IHD Auditors

Plaintiff alleges that even after the 2005 policy statement indicating that the EB would no longer conduct audits, some IHD auditors were detailed to other divisions of the FCC—in particular the OMD— to perform substantive auditing work and she further claims that the decision not to detail her was based on discrimination and retaliation.  (Pl.'s Opp'n at 11-12.)  It is undisputed that all remaining IHD auditors were detailed to OMD in 2009 (Def.'s Stmt. ¶ 29; DeNigro Dep. 36:4-36:12; 36:18-37:3), so any claim for damages will be limited to the time period prior to plaintiff's transfer.  Defendant seeks summary judgment on this claim, arguing that Bright cannot establish that this decision was made for discriminatory or retaliatory reasons. (Def.'s Mot. at 31.)  It also argues that it has submitted a legitimate, nondiscriminatory reason for its work assignment, which it claims that Bright has not rebutted.  (Def.'s Reply at 5-7.)

According to defendant, there is a "legitimate, nondiscriminatory reason" for detailing ten auditors (nine of whom were Caucasian and eight of whom were male) to the OMD while

leaving eight auditors (two of whom were African American, two of whom were female, and four of whom had filed EEO complaints or union grievances) to perform non-audit work in the IHD.   (Def.'s Mot. at 31-32; Def.'s Reply at 5-7.)   This decision was, according to the declaration of a Human Resources Specialist in the OMD, "based on the operational needs of OMD."   (Green Decl. ¶ 4; Def.'s Reply at 6.)

Title VII defendants typically offer far more detailed explanations for the actions at issue. *See, e.g.*, *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (weighing evidence where employer explained that another applicant was more qualified than the plaintiff); *see also Boone v. Clinton*, 675 F. Supp. 2d 137, 147 (D.D.C. 2009) (applying *Aka*, which dealt with a claim of age discrimination, to claims of racial and gender discrimination under Title VII); *Martinez v. P.R. Fed. Affairs Admin.*, No. 08-404, 2011 U.S. Dist. LEXIS 109025, at *37-38 (D.D.C. Sept. 26, 2011) (explaining that a budget reduction was the reason for terminating the plaintiff); *Evans v. Dist. of Columbia*, 754 F. Supp. 2d 30, 47 (D.D.C. 2010) (explaining that the need to hire additional people to reach proper staffing levels was the reason for the reduction in the plaintiff's duties).   In contrast, defendant's explanation here is, at best, opaque for it provides no clue as to what is meant by "operational needs," nor any indication as to how the chosen auditors fulfilled those needs or why Bright was not chosen.   As Bright points out, defendant's reason provides no insight into its decisionmaking process (*see* Pl.'s Stmt. ¶ 20) and as a result, the legitimacy of the proffered reason simply cannot be assessed based on the record before the Court.

In addition, Bright offers several arguments relating to demographic disparities.   (Pl.'s Opp'n at 2-3, 11, 14-15.)   The record shows that one out of the three African American auditors was detailed to the OMD to perform substantive work while two remained to perform clerical

work in the IHD.  (*See* Green Decl.)  Nine out of thirteen Caucasian auditors were detailed to the

OMD while four remained in the IHD.  (*Id*.)  She has also shown that two out of five female

auditors were detailed to the OMD while three remained in the IHD.  (*Id*.)  Eight out of thirteen

men were detailed to the OMD while five remained in the IHD.  (*Id*.)  In addition, Bright argues

that the detailing of the ten auditors to the OMD, which deviated from the normal procedures

prescribed by the collective bargaining agreement, is relevant to her discrimination claim.  (Pl.'s

Opp'n at 15; *see* Pl.'s Opp'n, Ex. B (Def.'s Resp. to Pl.'s Interrogs. ("Def.'s Interrogs. Resp."))

at 5; *id*. at Ex. J.)  Specifically, the agreement provides that FCC employees maybe detailed for

reasons including meeting temporary needs, responding to temporary shortages, or pending

official reassignment, but that details longer than 120 days must be processed competitively.  (*Id*.

at 2-3)  The OMD details, which were largely, if not all, over 120 days (*see* Def.'s Interrogs.

Resp. at 15-16), were not subject to a competitive application process, but rather given out

through a selection process that defendant justifies as based on "operational needs."  Deviation

from the established selection practice, as is apparently the case here, has been recognized as "a

factor that the trier of fact may deem probative . . . in determining the true motivation behind the

hiring decision of the prospective employer."   *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir.

1982); *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 508-509 (D.C. Cir. 2005)

("We agree … that a jury could infer something 'fishy' from the [deviation from ordinary

procedures].  Specifically, a jury could conclude that [defendant] failed to provide a 'fairly

administered selection process' and that its claim to the contrary is pretextual."); *Lathram v.

Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) (holding that, where an agency departed from its

normal process without justification, "[s]uch an unexplained inconsistency can justify an

inference of discriminatory motive").

While it may be true, as argued by defendant, that plaintiff's arguments will not ultimately be sufficient to allow plaintiff to carry her burden as to pretext, the Court need not resolve this issue at this stage, for the Court is unable to find that defendant's proffered reason for its selection—which is little more than "because we said so"[14] —is sufficient to defeat plaintiff's claim.  Since the above-argument is the only basis defendant offers for dismissing plaintiff's retaliation claim, it must also be rejected and this claim will not be dismissed, although it bears noting that plaintiff's complaints provide no actual support for this claim, nor is there any evidence of a causal link between the details and any protected activity.[15]

**B.**    **Work Assignments Among the IHD Auditors**

Bright also alleges discrimination and retaliation in the assignment of work to those auditors who were not detailed to the OMD, but remained within the IHD.  (Pl.'s Opp'n at 11-16.)  Defendant seeks summary judgment on this work assignment claim on the basis that there was a policy shift in the nature of the IHD work in 2005 and that the auditors who remained in

---

[14] Although defendant makes two additional arguments to show that that its detail decision is not pretextual, neither is availing.  First, it offers evidence of the fact that Bright was offered other details.  (Def.'s Stmt. ¶ 28; Def.'s Mot. at 32.)  Bright counters, and defendant does not dispute, that these details did not consist of audit work.  (*See* Pl.'s Stmt. ¶ 18; *cf.* Def.'s Stmt. ¶ 18 (describing work as "substantive," but not as auditing work).)  The offering of other details, particularly those that did not involve auditing work, does not undermine the claim that Bright advances here.  Second, defendant asserts that the "fact that all of the IHD auditors were ultimately transferred to [other divisions] further undermines [p]laintiff's argument that the decisions were based on … discrimination."  (Def.'s Mot. at 32.)  However, this could just as well demonstrate that the auditors who remained in IHD after the 2005 policy shift were as qualified for auditing work as those who were initially detailed— and that it was a consequence of discriminatory decisionmaking that they were forced to wait longer to engage in substantive auditing work.

[15] The only protected activity that is clearly identified  in the complaints is plaintiff's filing of an EEO complaint in May 2007, but as the undisputed evidence makes clear, most of the details took place before she engaged in protected activity, and therefore, there cannot, as a matter of law, be a causal link.  (*See supra* note 3.)

the IHD had to perform non-auditing work and that assignments did not differ on the basis of race or sex.  (Def.'s Mot. at 16.)

The record is clear that Bright was assigned clerical work after 2005 because the previously-existing IHD auditing work ceased to exist after Chairman Martin decided that the EB would no longer conduct FCC enforcement via audits  (Def.'s Stmt.  ¶ 6, 9; *see* DeNigro Dep. 18:12- 19:1), that the IHD's substantive work changed  (*see* DeNigro Dep. 18:8-20:13, 28:4-28:9; Harkrader Dep. 97:13-97:25; Bright Dep. 20:18-20:24), and that Bright was assigned the same type of work as her colleagues in the IHD.  (Bartolome Dep. 17:1-18:15; Boyle Dep. 117:24-118:23; DeNigro Dep. 29:1-29:9; Bright 91:1-91:3.)

Nonetheless, Bright asserts that "she was discriminated against based on her race and gender and in retaliation for protected activity when she was assigned to clerical work in the indecency project," but she fails to cite any competent evidence to support this claim.  Rather, she relies on her own conclusory statements that work was assigned in a discriminatory fashion and that she received the brunt of the clerical work (*see* Pl.'s Opp'n at 11-12 ("[W]hile a number of auditors worked on the indecency project along with Ms. Bright, Ms. Bright was not given substantive work on the project and was instead relegated to clerical tasks such as data entry and preparing mailings."); *id.* at 15; Pl.'s Stmt. ¶¶ 10-14 (citing to Bright's own interrogatory responses)),[16] which are, as a matter of law, insufficient to satisfy plaintiff's burden.  *See*

---

[16] In an attempt to buttress her statements, Bright relies upon Exhibit E, which contains Patricia Green's interrogatory responses in Green's own EEO proceeding.  (Pl.'s Opp'n, Ex. E.)  Bright does not provide a page number or otherwise indicate why Green's responses support her claim. On the contrary, in the fourteen page, single-spaced document, her name is only mentioned once and it does not relate to the tasks that Bright performed.  (*Id.* at 12.)  She also cites to Exhibit L as demonstrative of the FCC's "clear pattern of discriminatory practices relating to promotions and work assignments."  (Pl.'s Opp'n at 14.)  Since Exhibit L appears to be a list of the training seminars that various employees attended and a number of personnel action slips, the Court cannot fathom its relevance to plaintiff's argument regarding work assignments.

*Williams v. Dodaro*, 576 F. Supp. 2d 72, 87 (D.D.C. 2008) ("Mere allegations and conclusory

assertions made on the basis of 'belief' do not suffice to establish discrimination for purposes of

the *McDonnell Douglas* test."); *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

In fact, her own statements undermine her claim that "after February 2005, whoever needed any

type of clerical or function, you know, my name was submitted" (Bright Dep. 21:5-21:7), since

she admits that Patricia Green, a Caucasian woman, was also assigned data entry (Pl.'s Stmt. ¶

14; *see also* Pl.'s Opp'n, Ex. E.), and she concedes that she had been given a Caucasian assistant

to perform the clerical task of typing her hand-written letters.  (Pl.'s Opp'n at 16.)

Bright also attempts to show discrimination by arguing that two auditors who live in New

York were still performing auditing work after the 2005 announcement.   (Pl.'s Opp'n at 14-15;

2008 Compl. ¶ 19.) Although adducing evidence of disparate treatment of similarly situated

employees may establish pretext, *see Brady*, 520 F.3d at 495, Bright has not made such a

showing here.  As defendant has explained, the New York auditors were not in fact similarly

situated to Bright: namely, they were continuing work on previously-begun audits.  (*See* Def.'s

Mot. at 17-19; Boyle Dep. 121:9-122:14; DeNigro Dep. 20:21-21:4).  In Bright's case, by

contrast, there was no longer work to be done on the single auditing job on which she worked

(Bright Dep. 24:9-24:1, 48:2-48:7), and thus, she cannot argue that she was "similarly situated"

in that respect.  *McFadden v. Ballard Spahr Andrews & Ingersoll*, LLP, 611 F.3d 1, 4 (D.C. Cir.

2010) (finding that allegation that other employees received accommodations not offered to the

plaintiff did "not provide the slightest reason to doubt" the defendant's proffered explanation

where the plaintiff had failed to show that she was similarly situated to the alleged comparators);

*Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008) (finding that

allegation that other employees were treated more favorably could not establish pretext where

plaintiff had not shown "all of the relevant aspects of [his] employment were nearly identical") (internal quotation marks omitted)).

With respect to her retaliation claim, Bright alleges that her work assignments became more menial, even among the IHD clerical duties, as a result of her complaint about discrimination. (Pl.'s Opp'n at 15-16.)[17] Her retaliation allegation here differs slightly from her above claim of discrimination. She points to two specific incidents that, she says, demonstrate retaliatory animus. (Pl.'s Opp'n at 15-16.) First, she alleges that, on June 26, 2007, she was assigned to stuff envelopes and prepare mailing slips on the same day that she had a meeting with the EB Bureau Chief following a meeting that was part of the EEO process and "immediately" after she filed an EEO complaint. (Pl.'s Opp'n at 15.) Second, she alleges that, in November 2008, she was removed from two substantive work assignments and reassigned to indecency project assignments and further that she was assigned a disproportionately large number of indecency complaints from November 2008 through June 2009. (*Id*. at 16.)

As is the case with her discrimination claim, her retaliation claim fails because there is a lack of competent evidence that she was treated differently than her colleagues in the IHD, all of whom were doing non-audit work, including indecency cases. (Def.'s Reply at 3-4.) As explained above, there is no indication, aside from her unsupported statements, that her assignments were more clerical than her colleagues' assignments. Moreover, her claim is further negated by her contention that, of the eight auditors left in the IHD, at least four of them had filed EEO complaints or union grievances, making it difficult, if not impossible, to infer that she was singled out for protected activity.

---

[17] Again, it is not entirely clear what protected activity is alleged to have prompted the supposed retaliatory conduct. The only protected activity clearly identified is the 2007 EEO Complaint. However, the allegedly discriminatory/retaliatory change in her work assignments (*i.e.* assigning clerical instead of auditing work) dates back to 2005. (Pl.'s Opp'n at 14; Bright Dep. 22:12-13.)

Accordingly, the Court concludes that there is no basis upon which a reasonable juror could conclude that defendant's assignment of work to plaintiff was motivated by discriminatory or retaliatory animus.

## III.   DENIAL OF REQUEST FOR REASSIGNMENT

Plaintiff also alleges that defendant violated Title VII by denying her request for reassignment to the Atlanta field office.  (Pl.'s Opp'n at 17.)  Defendant argues that its decision not to assign Bright to serve as an auditor in the Atlanta field office does not constitute an adverse action within the meaning of Title VII[18] (Def.'s Mot. at 25), and it also offers a legitimate, nondiscriminatory reason for not assigning plaintiff to the Atlanta office.  (*Id*. at 25-30.) [19]

Under Title VII, an adverse employment action sufficient to support a discrimination claim is one that creates "a significant change in employment status such as hiring, firing, failing

---

[18] The parties appear to view the action at issue here slightly differently; Bright sees the action as a denial of her request for reassignment, whereas defendant explains that, as a practical matter, the granting of her request would mean creating a new position. This difference is not relevant for the purposes of resolving the instant dispute because it does not change the analysis.

[19] Despite language by the Circuit in *Brady* suggesting that a defendant may be foreclosed from attacking the sufficiency of the plaintiff's prima facie case when the defendant asserts a legitimate, nondiscriminatory reason for its employment action, 520 F.3d at 493-94 (noting that "once the employer asserts a legitimate, nondiscriminatory reason, the question whether the employee actually made out a prima facie case is no longer relevant'" and instructing the district court not to analyze whether the plaintiff has made out a prima facie case once the employer articulates a legitimate, nondiscriminatory reason for the adverse action) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993)), this is not always the case.  *See Ginger v. Dist. of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008) (explaining that because the defendant argued that the challenged action was not materially adverse and also proffered a legitimate reason for the action, "[w]e analyze first whether the [action] was a sufficiently adverse action to support a claim under Title VII [and] then consider whether the [plaintiffs] have adduced sufficient evidence of discrimination to put their case before a jury"); *Adesalu v. Copps*, 606 F. Supp. 2d 97, 103 (D.D.C. 2009) (noting that "[w]hile *Brady* directs the district court's focus to the employer's proffered non-discriminatory reason, the Court still first must determine whether plaintiff has suffered an adverse employment action").

to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits. " *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Establishing an adverse action requires that the employee "experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas v. Preston*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotations omitted); *see Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002).   "Actions short of an outright firing can be adverse within the meaning of Title VII, but not all lesser actions by employers count." *Id.* at 1130.  For example, "[m]ere idiosyncracies of personal preference are not sufficient to state an injury." *Id*. (quoting *Brown v. Brody*, 199 F.3d 457, 466 (D.C. Cir. 1999)).  And "[p]urely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions." *Id*. (internal citations and quotations omitted).

   An actionable injury in the context of a retaliation claim under Title VII differs from that under the anti-discrimination provision.  Its anti-retaliation provision provides recourse for "materially adverse" actions that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006); *Gaujacq v. EDF, Inc*., 601 F.3d 565, 570 (D.C. Cir. 2010).

   It is established that "a plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown*, 199 F.3d at 457.  It is therefore not enough for Bright to merely claim that she

was denied a desired reassignment to another location. *Id.* She has not identified any "objectively tangible harm" resulting from defendant's refusal to reassign her to the Atlanta office, *see id.* at 457, and she has not indicated how this denial could possibly dissuade a reasonable worker from "making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry.*, 548 U.S. at 57. Moreover, she has failed to respond to defendant's argument that this did not constitute an adverse action and, therefore, this Court will treat that argument as conceded. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 Fed. Appx. 8 (D.C. Cir. 2004); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").[20]

---

[20] Even if the denial of the request for reassignment could be considered to be a "materially adverse" action, summary judgment would still be appropriate because defendant has offered a legitimate, nondiscriminatory/nonretaliatory reason which Bright has not rebutted. The record establishes that for an EB employee to be considered for reassignment to a field office, "there needs to be a vacancy at the field office." (Def.'s Stmt. ¶ 22; Dillon Dep. 153:17-154:23). It further shows that the Atlanta field office was only staffed with engineers and compliance specialists and therefore it had no auditor positions available. (Def.'s Stmt. ¶ 23; Montieth Dep. 98:4 –98:10.) At the time of Bright's request for reassignment, the only open positions were the senior agent engineer position and the compliance specialist position. (Def.'s Stmt. ¶ 24; Dillon Dep. 151:23-152:14.) Moreover, this explanation is not undercut by Bright's reference to the two auditors who worked out of the New York field office as an example of the fact that reassignment does occur within the EB. (Pl.'s Stmt. ¶ 22; Pl.'s Opp'n at 15.) These individuals were not reassigned to the New York field office, but rather, they were permitted to continue on as part of the New York field office when their bureau was disbanded through an arrangement made during an earlier reorganization. (Def.'s Stmt. ¶ 25; Def.'s Mot. at 39; *see* DeNigro Dep. 22:7-23:2; Montieth Dep. 99:22-100:13; Bright Dep. 110:13-110:23.) Given the distinct way in which the New York auditors became incorporated into the EB and how they came to be part of the New York office (which was not through a reassignment like Bright requested), it is clear that they were not "similarly situated." *Royall*, 548 F.3d at 145.

IV.     **IN-PERSON MEETING ON MAY 1, 2009**

Bright also claims discrimination and retaliation based on defendant's decision to require attendance at a meeting on May 1, 2009, which was one of the days that she expected to work from home.  (2010 Compl. ¶ 17; Pl.'s Opp'n at 20-21.)  Defendant seeks summary judgment on the ground that the in-person meeting was not an adverse employment action (Def.'s Mot. at 36-37), or, alternatively, that plaintiff has failed to rebut the legitimate, nondiscriminatory/nonretaliatory reason that it has proffered for requiring Bright to attend this meeting.  (Def.'s Mot. at 36-39.)

Again, Bright fails to address defendant's argument that this action did not constitute an adverse action, but instead, she merely attempts to cast doubt on defendant's reason.  (*Id.*)  Even if the argument had not been conceded, which it has, it is clear that calling her into the office for a face-to-face meeting, as pre-committed by her telecommuting agreement and after learning that she had not actually worked for four months, falls far short of the kind of actionable injury necessary for a discrimination claim under Title VII.  *See Forkkio*, 306 F.3d at 1130.  And, while it is true that an actionable injury in the context of a retaliation claim under Title VII is different and perhaps less onerous than a discrimination claim, it is still the case that requiring an employee to attend a face-to-face meeting does not rise to the level of severity that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry.*, 548 U.S. at 57; *Gaujacq*, 601 F.3d at 577.[21]

---

[21] Even if it were an adverse action, which it is not, plaintiff has not rebutted defendant's legitimate, nondiscriminatory/nonretaliatory reason for doing so.  Here, defendant has explained that Bright had to attend the meeting because Bartolome, her supervisor, had learned that Bright not done any work while assigned to a detail and wanted to check in with her face-to-face to determine the status of her IHD cases.  (Def.'s Mot. at 37-39; Bartolome Dep. 45:4-48:2.)   The meeting needed to be in the office because it required the use of computer databases located onsite and because Bright would need to rely upon the assistants, which  the FCC provided as a medical accommodation, who were physically at the office.  (*Id*. 47:7-47:21.)  Furthermore,

## V.   MEDICAL ACCOMMODATION

Bright also raises claims under Title VII relating to defendant's failure to provide sufficient accommodations for her carpal tunnel syndrome and chronic cervical cancer.  (*See* 2010 Compl. ¶¶ 7-11, 14, 25.)  She alleges that defendant provided inadequate and "grossly delayed" accommodation and that defendant required her to work on clerical tasks which exacerbated her disabilities and that these actions were "based on race and gender and in retaliation for her prior protected activity."  (Pl.'s Opp'n at 21-23.)

While defendant devotes much of its motion to rebutting plaintiff's allegation of failure to accommodate her various disabilities, its fails to even contest the fact that plaintiff bases her claim on Title VII only, and not the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, and that whether defendant did a worksite assessment or assigned work that exacerbated her disabilities is simply irrelevant given the total absence of *any* evidence that these actions were the result of discrimination or retaliation.

Bright does not provide any evidence that other employees received worksite assessments or that their accommodation requests were handled differently than hers,  *Okoroji v. Dist. of Columbia*, No. 94-1442, 1998 U.S. Dist. LEXIS 10704, at *24-25 (D.D.C. July 8, 1998), *aff'd*, No. 98-7155, 1999 U.S. App. LEXIS 4002 (D.C. Cir. Feb. 2, 1999) (finding failure to establish

---

Bartolome explained that he could not wait for a non-telecommuting day to meet with Bright because she was not due into the office for two more work days.  (Bartolome Dep. 47:10-48:14.) In response, Bright merely asserts that defendant has not carried its burden and that two Caucasians who telecommuted were "never required to attend meetings at headquarters"  (Pl.'s Mot. at 21), but does not offer any evidence that these Caucasians were similarly situated nor does she show that other employees who stopped performing work without reporting it to their supervisors were treated in a different manner.  *See McGill v. Munoz*, 203 F.3d 843, 848 (D.C. Cir. 2000) (finding no pretext where defendant complied with agency policy and plaintiff "offered no evidence that employees with similarly suspicious patterns of absenteeism were treated any differently than she was").

discrimination claim where plaintiff "d[id] not allege that other employees received different or better treatment than she"),  nor is there a scintilla of evidence that Bright's medical problems were not accommodated with respect to her work assignments because of race, sex  or retaliation. Therefore, all medical-disability-related claims, whether for discrimination, retaliation, or harassment, must be dismissed.

## VI.    HOSTILE WORK ENVIRONMENT

In her complaints and opposition, Bright presents a number of examples of interactions between herself and EB management that, she contends, constitute a hostile work environment.[22] In particular, she alleges that she was subjected to severe harassment motivated by discrimination and retaliation, which materialized through (1) comments and "verbal attacks by management"  (Pl.'s Opp'n at 20), (2) "excessive scrutiny" of her work (*id.* at 18-21), (3) the existence of the FCC indecency policy which permits use of the word "nigger" (2008 Compl. ¶ 21), and (4) "requiring her to perform clerical duties, despite her medical restrictions."  (2010 Compl. ¶ 25.)[23]  Defendant seeks summary judgment on the grounds that (1) the acts for which Bright sues are not sufficiently adverse to form the basis of a claim for harassment (Def.'s Mot. at 33-35), and (2) Bright has not demonstrated that they were motivated by race or gender-based discrimination or by retaliation.  (Def.'s Mot. at 34; Def.'s Reply at 7-8.)

---

[22] "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).  Given the structure of Bright's opposition and its discussion of these various acts collectively, it appears that these allegations are intended to support her hostile work environment claim.  (*See* Pl.'s Opp'n at 18-20; *see also* 2010 Compl. ¶ 25; 2008 Compl. ¶ 20.)

[23] Plaintiff cannot invoke claims relating to her medical condition to make a case under Title VII for harassment when they are, as this Court has already explained, unsupported by evidence of discrimination or retaliation.  *See Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (explaining that claims found not to be discriminatory conduct are insufficient to support discrimination-based hostile work environment claim).

To prevail on a hostile work environment claim, "a plaintiff must show that h[er] employer subjected h[er] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).  To establish a prima facie hostile work environment claim, a plaintiff must demonstrate (1) that she is a member of a protected class, (2) that she was subject to unwelcome harassment, (3) that the harassment occurred because of her membership in a protected class, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent it.  *Jones v. GlaxoSmithKline, LLC,* 755 F. Supp. 2d 138, 149 (D.D.C. 2010) (citing *Lester,* 290 F. Supp. 2d at 22).

"To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch,* 550 F.3d at 1201; *see also Lester,* 290 F. Supp. 2d at 22 ("The key terms, then, are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment.") (internal quotations omitted). The "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).  This standard is "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Id. (*quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998)).  It is also critical to establish that the hostile work environment was the result of discrimination based on a protected status or retaliation based on protected activity.  As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or
> perceived) disability; and many bosses are harsh, unjust, and rude.
> It is therefore important in hostile work environment cases to
> exclude from consideration personnel decisions that lack a linkage
> of correlation to the claimed ground of discrimination. Otherwise,
> the federal courts will become a court of personnel appeals.

*Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

Bright alleges that she was subjected to a hostile work environment through "verbal attacks by management." (Pl.'s Opp'n at 20.) In support, she cites the following: her supervisors admonished her on various occasions, one used profanity twice at which point a second supervisor did not intervene, and Dillon stated that she did not possess the technical background to become an engineer so as to "demean[] her accomplishments." (Pl.'s Opp'n at 19-20.) Although Bright's testimony reflects a level of friction between her and her supervisors, her allegations are insufficient as a matter of law to establish a hostile working environment claim. *See, e.g.*, *Baloch*, 550 F.3d at 1201 (affirming finding of no actionable hostile work environment where, on multiple occasions, defendant yelled, used profanity, threatened arrest, and described plaintiff's work as "bullshit"); *Holmes–Martin v. Sebelius*, 693 F. Supp. 2d 141, 165 (D.D.C. 2010) (holding that plaintiff's claims that she was publicly criticized, received unwarranted criticism in her performance evaluations, given reduced job responsibilities, excluded from meetings, and received unrealistic deadlines were not sufficiently severe or pervasive to support a hostile work environment claim); *Badibanga v. Howard Univ. Hosp.*, 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing hostile work environment claim where plaintiff was placed on administrative leave due to a false accusation, his accent was criticized, he was told he was easy to replace with an American, and was told that his supervisor would not hire other Africans); *Johnson v. Dist. of Columbia*, 572 F. Supp. 2d 94, 108-110 (D.D.C. 2008) (dismissing hostile work environment claim where plaintiff alleged he was not paid a promised

pay increase, his responsibility was reduced, he was told he was "out of order" in inquiring about his reassignment of duties, and he was constantly ridiculed).

Bright also alleges that she was subjected to a hostile work environment through excessive scrutiny of her work assignments and the time restraints imposed upon her.  (2010 Compl. ¶¶ 10, 19.)  These very types of claims have consistently been rejected as evidence of a hostile work environment.  *See, e.g.*, *Hussain*, 435 F.3d at 366-367 (finding that plaintiff failed to sustain a hostile work environment claim based on heightened monitoring by supervisors); *Graham v. Holder*, 657 F. Supp. 2d 210, 217 (D.D.C. 2009) ("Being subjected to 'scrupulous monitoring' does not support a claim for hostile work environment because 'it is part of the employer's job to ensure that employees are safely and properly carrying out their jobs.'") (citation omitted); *Lester*, 290 F. Supp. 2d at 30 (finding supervisors' request to know plaintiff's whereabouts and activities reasonable).  Moreover, contrary to plaintiff's claims, Bright's work was not excessively scrutinized: Bright's supervisors initially reviewed her work pursuant to periodic checks of all auditor work and subsequently scrutinized her work after finding her work incomplete and improperly done.  (Bartolome Dep. 51:13-52:13; 53:6-54:7; Def.'s Mot. at 35-36.)

Lastly, Bright alleges that the existence of the FCC policy, which "allows… [broadcasters] to maintain usage of the word 'nigger'" is "highly offensive" and lends itself to the creation of an extremely hostile work environment…."  (Pl.'s Opp'n at 2; 2008 Compl. ¶ 21.) Bright has not shown how that the existence of this alleged policy[24] subjected her to the "discriminatory intimidation, ridicule, and insult" of such "sever[ity] or pervasive[ness] [as] to alter the conditions of [her] employment and create an abusive working environment."  *Harris*,

---

[24] Defendant disputes the assertion that the FCC has such a policy.  (*See* Def.'s Interrogs. Resp. at 17.)

510 U.S. at 21-22 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Thus, Bright cannot establish a hostile working environment claim based on the existence of this FCC policy.

Though plaintiff clearly had several contentious interactions with some of her supervisors and disliked the way her supervisors spoke to her, no reasonable jury could find that the "offensive remarks" and "verbal attacks" she alleges (Pl.'s Opp'n at 19-20) were "so 'severe' or 'pervasive' as to have changed the conditions of [her] employment," *Baloch,* 550 F.3d at 1201 (quoting *Harris,* 510 U.S. at 21), or that such harassment was the result of either discrimination or retaliation.  The Court, therefore, will grant defendant's motion for summary judgment as to Bright's hostile work environment claims.

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment in part and denies it in part.  A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   December 9, 2011